UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MSP REAL ESTATE, INC.,<br>a Minnesota corporation; and<br>DEER CREEK HOMES, A WISCONSIN<br>LIMITED PARTNERSHIP, a limited<br>partnership,<br><br>                  Plaintiffs,<br><br>  vs.<br><br>CITY OF NEW BERLIN,<br>a Wisconsin municipal corporation; and<br>JACK F. CHIOVATERO, individually and in<br>his official capacities as the Mayor of the City<br>of New Berlin and a member of the Common<br>Council and the Plan Commission of the City<br>of New Berlin,<br><br>                  Defendants. | Civil Action No. 11-CV-_____ |

**COMPLAINT**

The plaintiffs, MSP Real Estate, Inc. (MSP) and Deer Creek Homes, a Wisconsin Limited Partnership (Deer Creek), by their attorneys named below, for their complaint against the defendants, the City of New Berlin (New Berlin) and Jack F. Chiovatero, allege as follows:

**THE PARTIES**

1.      The plaintiff MSP is a corporation, duly organized and existing under the laws of the State of Minnesota, with its principal place of business located in St. Louis Park, Minnesota.

2.      The plaintiff Deer Creek is a limited partnership, with its principal place of business located in St. Louis Park, Minnesota.

3. The defendant New Berlin is a Wisconsin municipal corporation, duly organized as a city under Wis. Stats., ch. 62, and is located in Waukesha County, Wisconsin.

4. Defendant Chiovatero, an adult individual, is the duly elected and acting mayor of New Berlin and a member of its Common Council and its Plan Commission. He is sued in his official capacities and in his individual capacity. He is a resident of New Berlin and of the State of Wisconsin.

## JURISDICTION

5. This Court has jurisdiction over this action under the following statutes:

    A. The Court has jurisdiction under 28 U.S.C. § 1331, as this action arises under laws of the United States.

    B. The Court has jurisdiction under 42 U.S.C. § 3613(a)(1)(A), as this action seeks to enforce the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

## FACTS

### Events Preceding or Occurring in Early 2010

6. This action relates to real estate located within the City Center development, located near 14901 West Library Lane, in New Berlin. The City Center development plan was adopted by New Berlin on November 8, 1999 and provided for a so-called "mixed use" of commercial and residential buildings. As part of the development plan, a portion of the land within the larger City Center development was zoned by New Berlin for high-medium density multifamily housing. Among the land so zoned was land referred to herein for convenience as the "Deer Creek City Center Site."

2

7. Deer Creek was the initial developer of the Deer Creek City Center Site. In 2004 it acquired that land and obtained approvals from New Berlin to construct 118 units of condominium housing and conceptual approval to construct an additional 34-unit building, including obtaining certain zoning waivers from New Berlin's Plan Commission and a zoning permit to construct its development. Also, in 2005, Deer Creek entered into a development agreement with New Berlin, which was approved by New Berlin's Common Council and dealt with the installation of public infrastructure in connection with the development, including the construction of streets and the installation of sewer and water pipes in the public right of way.

8. Between 2005 and 2007, Deer Creek constructed the first of several planned phases of its project, erecting both a building containing 15 condominium units and associated public infrastructure. Thereafter, Deer Creek experienced severe financial difficulties, leading ultimately to a foreclosure of its interests in the Deer Creek City Center Site by its lender, AnchorBank, f.s.b., and conveyance of the unsold portions of the site to an affiliate of AnchorBank. That affiliate and MSP later entered into an agreement in which MSP agreed to purchase the undeveloped portions of the site. The undeveloped portions of the Deer Creek City Center Site are referred to herein for convenience as the "MSP City Center Site."

9. This action arises generally out of illegal actions taken by the defendants, the City of New Berlin and its mayor, Jack F. Chiovatero, to prevent MSP from developing and constructing 80 new multifamily housing units and 100 senior apartments on the MSP City Center Site. The actions were illegal because the race of prospective tenants of the housing was a motivating factor in the actions of New Berlin and Mayor Chiovatero, and because their actions will have a disproportionate impact on the availability of housing within New Berlin to

minorities, in violation of the federal Fair Housing Act, 42 U.S.C. § 3604. They were also illegal as violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. (the ADA).

10. The new multifamily housing units were intended for occupancy by tenants who have a regular source of income but whose annual household income does not exceed 60% of Waukesha County's median income, which, depending on the size of the family, ranges from approximately $30,000 (for a single person) to approximately $50,000 (for six persons). The units were intended to be rented at below-market rents for the area, as determined by the United States Department of Housing and Urban Development. MSP has been awarded $24,881,400 in tax credits for these developments by the Wisconsin Housing and Economic Development Authority (WHEDA), under a program authorized by Congress, 26 U.S.C. § 42, the Low-Income Housing Tax Credit program. The terms of the award require that these units be rented at affordable rates for at least 30 years.

11. After agreeing to acquire the MSP City Center Site, MSP spent over five months conducting due diligence and exploring the appropriateness of the site for its project, before making the decision to expend significant funds for such expenses as fees to reserve tax credits and for engineering, architectural, and legal services for the project. MSP's development plan for the MSP City Center Site received support from New Berlin, including from elected officials, appointed members of the Plan Commission, and the Department of Community Development (DCD) staff. This support ranged from Mayor Chiovatero's notifying WHEDA on April 5, 2010, in writing, that he supported the development to the DCD staff's working with MSP in late April to assure that certain Wisconsin Department of Natural Resources permits

4

were transferable to MSP. When MSP requested assurance, before making this substantial financial commitment, Mayor Chiovatero also directly assured MSP that he supported the development.

12. During the due diligence process, MSP became aware of the serious need within New Berlin and Waukesha County generally for affordable housing for families with disabled children. In response to the requests of parents and at the specific urging of New Berlin's DCD staff, MSP elected to make 20% of the units handicap accessible. In addition to redesigning the units to that end, MSP added nine units targeted to the needs of disabled individuals in families that earn no more that 40% of the area median income, to ensure the affordability of those units.

13. The mayor's pledge of support and the general cooperation of New Berlin's staff with MSP in its development planning was fully consistent with New Berlin's Comprehensive Plan, a long-range plan that Wisconsin's "Smart Growth" law required all municipalities in the state to adopt by 2010. New Berlin adopted its 2020 Comprehensive Plan on December 8, 2009, the first objective of which is to "[p]rovide for a wide choice of housing types throughout the City serving persons of different income levels, ages, and special needs." According to the Comprehensive Plan, 28.5% of all the households currently in New Berlin have income and benefits (in 2007 inflation-adjusted dollars) of less than $50,000 per year.

14. Under the provisions of the applicable ordinance, in order for MSP to proceed with the MSP City Center Site development, the Plan Commission had to approve the use, site plan, and architectural elements of the development and grant what the ordinance refers

to as "zoning waivers." In this case, only three such zoning waivers were required, all of which were of a perfunctory nature:

    a.    Reducing the length of a parking stall from 19 feet to 18 feet long. (The Plan Commission had previously granted this same waiver to the previously approved development at City Center.)

    b.    Positioning the entrance to the proposed driveway less than 100 feet from an intersection. (This location was supported and encouraged by both New Berlin's DCD staff and its consultant. This one-way driveway was to be used for convenient access for emergency vehicles and included a covered dropoff area for the senior residents.)

    c.    Reducing onsite parking from the level required in the ordinance. (This reduction was supported and encouraged by both New Berlin's DCD staff and its consultant, as it met the City Center design guidelines for reduced and shared parking.)

    15.    New Berlin's DCD staff recommended that the Plan Commission approve all the requested waivers, and the commission did so on May 3, 2010, by a vote of 4-3, with Mayor Chiavatero voting in the majority.

    16.    Following this approval by the Plan Commission, the only municipal approvals that were required in order for MSP to complete the development were of such a nature that they were delegated to the DCD staff and would have been, but for the illegal actions that occurred thereafter and are complained of herein, worked out between MSP and the DCD staff as a matter of course. In addition, although a development agreement, likely to have been substantially similar to the one already in place between Deer Creek and New Berlin with respect to installing public infrastructure, would have had to be approved by the Common Council, the

6

Common Council regularly approves these types of agreements with respect to developments throughout New Berlin, and approval of such a development agreement would likewise have followed as a matter of course.

17. Beginning immediately after the time of the Plan Commission approval, significant and heated public opposition to MSP's development plan arose. The opposition was very widely covered in the metropolitan and local papers and in the electronic media. New Berlin and Mayor Chiovatero were aware that the opposition to MSP's development plan, though sometimes publicly articulated as opposition to low-income housing, was at least in part based on racial hostility to minority group members who might become tenants.

18. This is in part because racial discrimination in housing often takes the form of opposition to low-income housing, because of the perceived lower socio-economic status of many minority group members and because of the demographic disparity between Waukesha County, with a 93.3% white, 4.1% Latino and 1.3% African American population (all figures from U.S. Census 2010 data) and neighboring Milwaukee County, which has a 60.6% white, 13.3% Latino, and 26.7% African-American population. The population of New Berlin itself is 96.5% white, 2.6% Latino, and only 0.7% African-American. Further, in this case, from the time in mid- to late-May 2010 when New Berlin and Mayor Chiovatero first took significant actions to prevent MSP from proceeding with its development, they were aware that public opposition to the proposed housing was in fact partly based on racial hostility to minority group members who might become tenants, and they acted to give official effect to that hostility.

19. In particular, Mayor Chiovatero was fully aware that opposition from members of the public to MSP's development had a very substantial racial component and was,

7

accordingly, unlawful. He was berated and vilified both publicly and privately for having supported the development. The racial underpinnings of much of the opposition was indicated by, among other things, a sign left facing his home, calling the mayor a "nigger lover." Opponents of the development, knowing that Mayor Chiovatero had been adopted as a child, even took the step of sending someone to check public records to see if he had any "African-American blood."

20. In the face of this determined opposition to MSP's development, which Mayor Chiovatero recognized as in part racially based, he decided to give in to the opposition in order to avoid further harassment and intimidation of himself and his family and to save his political career. Mayor Chiovatero made a calculated decision to give in to the racially motivated opposition and to carry their illegal wishes into effect as the action of New Berlin. Though he had been in the majority of the 4-3 vote of the Plan Commission to grant the waivers, he filed a motion on May 21, 2010 to reconsider that decision (a motion that only a member of the Plan Commission who had voted in the majority could make).

21. Mayor Chiovatero sent an email on Tuesday, May 25 to a constituent who had supported MSP's development, explaining what he was going to do and why:

> I am a prisoner in my own home. I have spent several hours a day last week listening and replying to concerned citizens. I spent all weekend doing the same. I went to Pick N Save to pick up a prescription and I was stopped by several people and it took an hour and a half to leave the store. I was asked NOT to attend two functions this weekend for fear it would distract and cause havoc by my presence. Our City is filled with prejudice and bigoted people who with very few facts are making this project into something evil and degrading.

8

> There are two appeals so far, and reconsideration I have before the Plan Commission to remove the parking waiver. At this time, listening to the residents who have been misinformed and formed an opinion of this project that is [*sic*]. In Politics, perception is reality and with that I will not continue my support myself. The develop [*sic*] sits in Minnesota, looking at this project and how it will effect [*sic*] his assets, and my family is being verbally abused and harassed. New Berlin is not ready, nor may never be, for a project like this.
>
> Unfortunately, I will be doing whatever in my power to end this project, it will result in lawsuits and making New Berlin a community of bigots.

22. From the time that Mayor Chiovatero announced his switch from supporting to opposing MSP's development, the attitude and actions of New Berlin's staff changed from support for MSP's development plan for the MSP City Center Site and cooperation with MSP in pursuing the plan to acts of passive resistance to and active interference with the development.

23. After Mayor Chiovatero announced his opposition to the development and filed his motion to reconsider the Plan Commission's approval of the zoning waivers, MSP, in an effort to mitigate its damages resulting from New Berlin's disapproval of MSP's development plan, and as an alternative to commencing litigation to enforce its rights under the Fair Housing Act, sought to reach a compromise with New Berlin and Mayor Chiovatero that would allow MSP to continue with the development.

24. MSP offered to reduce the number of low-income units in the development. The only response from the mayor and the City Attorney was that the plan would likely be approved if, instead of any low-income housing, all the units to be constructed would be designed for occupancy by senior citizens or as market-rate apartments. Such senior housing

9

is often viewed as acceptable in predominantly white municipalities like New Berlin because it does not attract significant numbers of minority tenants.

25. At its June 7 meeting, the Plan Commission, despite its awareness of the illegal character of the action it was taking, reconsidered the approval that it had given to MSP's development plan and denied approval of two of the three needed waivers that it had previously granted.

26. Thereafter, on June 8, New Berlin's Common Council approved a moratorium on all new development in the City Center area as a means of preventing MSP from developing the MSP City Center Site with low-income housing. This action was taken in furtherance of what the members of the Common Council knew to be the partially racially based opposition to the development. This moratorium has been continued from time to time and is currently still in effect.

27. In its continuing effort to reach agreement on an arrangement that would allow its development to proceed, MSP proposed changes to its site plan on June 18 that would have obviated the need for the rescinded zoning waivers. MSP's efforts to meet with the DCD staff and consultant to discuss the revised plan proved unavailing and, contrary to the staff's prior cooperative practice and behavior with MSP and developers generally, the staff refused to meet with or answer questions from MSP. Ultimately, without discussing it with MSP, the staff issued a report with a negative recommendation on the revised site plan, eight minutes before the DCD office closed for the weekend on Friday, July 2, at the same time that the staff sent its negative recommendation to the Plan Commission. MSP, aware of both the level of hostility now present in New Berlin to its plans and the likely effect of the staff's negative

recommendation, asked to meet with the staff, but the staff would not meet sooner than Thursday, July 8. MSP then asked to have consideration of its project at the Plan Commission meeting scheduled for July 12 postponed or tabled, so as to try to work with the DCD staff to address the issues in the report, but that request was refused.

28. On July 12, the Plan Commission met to consider MSP's revised site plan. MSP was not invited to speak at the meeting or to refute any statements made by the numerous members of the public who were allowed to speak at the beginning of the meeting. The meeting took place in an atmosphere of overt hostility to MSP on the part of a large crowd. Members of the public were permitted to speak, including one who said: "If being against low-income housing makes me a racist and a bigot, then I guess I am a racist and a bigot." The crowd erupted in cheers, and the Plan Commission unanimously denied approval of MSP's development.

29. Two days later, in response to a campaign to solicit signatures seeking to force a recall election to remove Mayor Chiovatero from office for having originally supported the MSP development, the mayor sent a letter to all households in New Berlin, taking credit for having blocked it. He wrote:

> In 2010, when the Section 42 Workforce housing came to public attention, it was clear that nearby residents did not want this project to go forward. In support of the residents, I have since researched a means to halt the project. I am committed to focusing on what suitable options are available. The City Staff and I have found justification for discontinuing the project and will now be focusing on alternatives.

30. Thereafter, the recall effort failed to gather sufficient signatures to force an election to remove the mayor.

11

## MSP's Alternative Plan – Late 2010 and Early 2011

31. In a further effort to mitigate its damages and as an alternative to commencing litigation, MSP continued its efforts to reach a compromise with New Berlin. Among other things, it decided in the late summer and fall of 2010 to explore an alternative plan to develop low-income housing on the same site.

32. In 2010, MSP acquired all ownership rights in Deer Creek.

33. New Berlin's staff repeatedly, including after the June 2010 Plan Commission vote withdrawing approval of the zoning waivers and after enactment of the moratorium on development, recognized that MSP, through its control of Deer Creek, had a valid and existing zoning permit to construct 102 condominium units of housing and could devote them to low-income housing qualifying for the tax credits that MSP had been awarded and a valid and existing 2005 development agreement that covered the attendant public infrastructure, regardless of the moratorium. Consequently, MSP amended its reservations of low-income housing tax credits so as to construct a 102-unit family project and a 43-unit senior project.

34. By January 2011, at the insistence of New Berlin's City Attorney, MSP and New Berlin's DCD and other staff members had negotiated an amendment to the 2005 development agreement that recognized that agreement's continuing validity for the purpose of installing public infrastructure but that made several minor changes to the development agreement, largely requested by DCD staff for New Berlin's benefit. This amendment required approval by the Common Council in order to become effective.

12

35. At a meeting on January 17, 2011, New Berlin's Board of Public Works, whose members included Mayor Chiovatero and three alderpersons, unanimously recommended approval of the amendment to the development agreement, as recommended by DCD and other New Berlin staff.

36. Nevertheless, by the time of the meeting of the Common Council only a few days later, on January 25, 2011, the same sort of public opposition to MSP's alternative development had arisen, motivated in part by the same unlawful racially based opposition to low-income housing and having the same disparate impact on the availability of housing within New Berlin for minorities, as the members of the Common Council were aware.

37. Although the proposed amendment to the development agreement dealt only with infrastructure matters relating to such things as the construction of streets and sewers in the public right of way, the Common Council refused to approve the amendment, by a vote of 5-1, with some votes in opposition coming from alderpersons who, only days earlier, had approved the amendment as members of the Board of Public Works. One alderperson explained his changed vote with the comment that MSP could proceed under the "original approved agreement" from 2005.

### New Berlin's Refusal to Issue Building Permits

38. Beginning in the immediate aftermath of the events of summer 2010 and the blocking of MSP's 180-unit development on grounds at least partially racial, Mayor Chiovatero and the Common Council have set up groups in the different areas of New Berlin, populated by known opponents of MSP's efforts to construct low-income housing, to participate

13

in so-called "listening sessions" as a cover for rezoning the MSP City Center Site so as to make it impossible for low-income housing to be constructed there.

39. Shortly after the Common Council's refusal on January 25 to approve the amendment to the development agreement, MSP told New Berlin that it would proceed to develop low-income housing at the MSP City Center Site as condominiums, under the existing zoning permit, and construct the attendant public infrastructure in accordance with the original, unamended 2005 development agreement between New Berlin and Deer Creek. MSP asked New Berlin to issue appropriate building permits so that it could begin construction.

40. On February 9, 2011 New Berlin's DCD staff made a proposal to amend the zoning ordinance applicable to the MSP City Center Site and New Berlin's 2020 Comprehensive Plan by imposing architectural changes and density requirements that are intended to and will, if given effect, prevent MSP from constructing any low-income housing at the MSP City Center Site. This proposal has been put on a fast track for adoption by the Common Council as early as April 2011.

41. New Berlin's response to MSP's request for the issuance of building permits, embodied in a letter dated February 10, 2011 from the City Attorney, was a series of arguments, based on facts incorrectly stated and faulty legal conclusions, to the effect that the 2005 development agreement was no longer in force and that construction of the 102 units could not be commenced. This position is fundamentally inconsistent with the position taken by New Berlin's staff—including the City Attorney—in recommending the amendment to that agreement for approval by the Common Council just a few days previously. Had the staff thought that the

14

2005 development agreement was no longer in effect, it would have negotiated a new agreement, not an amendment to the existing one.

42. All the actions that the defendants have taken to block MSP's low-income housing development at the MSP City Center Site have been the result of conscious, pusillanimous decisions by Mayor Chiovatero and other New Berlin officials to knuckle under to opposition to the development that they knew at the time and still know is in substantial part racially motivated and unlawful.

### Need for Injunctive Relief

43. The terms of the low-income housing tax credits awarded to MSP by WHEDA require that 10% of the total cost of the development have been expended by mid-October 2011, which requires that the initial stages of construction have been completed. Other requirements applicable to MSP's low-income housing tax credit set a deadline for the completion of construction of December 31, 2012, making it essential that construction begin no later than August 2011.

44. Unless the Court grants injunctive relief to permit MSP to begin construction promptly, the interest of MSP in constructing its development at the MSP City Center Site, as well as the strong national interest in preventing discrimination in housing on the basis of race and disability within New Berlin, will be defeated. While an appropriate award of damages may eventually compensate MSP for its losses, nothing but a prompt injunction from this Court will insure that this needed housing—thus far blocked by racial opposition that will, if it continues to prevail, have an illegal disparate impact on minorities and the disabled in New Berlin—is actually constructed.

45. If MSP is unable to obtain injunctive relief to permit it to construct its low-income housing development at the MSP City Center Site, it will suffer damages as a result of the violations by New Berlin and Mayor Chiovatero. Without either electing a damages remedy or limiting its damages claims should it become necessary to seek damages relief, MSP expects that the damages that it would sustain will include lost profits with a present value of no less than $12,995,996.

46. All conditions precedent to the plaintiffs' right to recover herein have been performed or have otherwise occurred.

**FIRST CLAIM: VIOLATION OF THE FEDERAL FAIR HOUSING ACT**

47. The plaintiffs repeat, reallege, and incorporate by reference herein, as though fully set forth, the allegations of paragraphs 1-46, above.

48. The prospective tenants of the planned MSP City Center Site development are individuals protected from illegal discrimination in housing under the federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq*.

49. The actions of New Berlin and Mayor Chiovatero constitute illegal discrimination in housing, in violation of the provisions of the federal Fair Housing Act.

50. The actions of the defendants complained of herein, violating the federal Fair Housing Act, will cause injury to the plaintiffs, making the plaintiffs aggrieved persons under the statute.

**SECOND CLAIM: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

51. The plaintiffs repeat, reallege, and incorporate by reference herein, as though fully set forth, the allegations of paragraphs 1-50, above.

52. MSP's proposed housing has been designed and intended to fill significant needs within New Berlin for disabled citizens.

53. A significant number of the prospective tenants of MSP's proposed development, because of their affliction with impairments which substantially impact their major life activities, are "qualified individuals with a disability," and therefore protected from discrimination by public entities under Title II of the ADA, 42 U.S.C. § 12131, *et seq*., and under the Fair Housing Act.

54. New Berlin is a public entity subject to Title II of the ADA.

55. MSP, by virtue of its intention to construct a significant number of units affordable and accessible to prospective disabled tenants, is associated with those prospective disabled tenants.

56. When New Berlin took its illegal actions to block the MSP City Center Site low-income housing development, it was aware and intended that its actions would deny proposed disabled tenants affordable housing to which they are entitled.

57. Upon information and belief, New Berlin's actions complained of herein were taken because of the disabled tenants' disabilities, in that preventing the construction of

MSP's proposed housing units will have a disparate and discriminatory impact on disabled individuals.

58. The actions of New Berlin violating the ADA will cause injury to MSP, which will suffer that injury because of its association with the prospective disabled tenants.

59. The actions of the defendants complained of herein constitute illegal disability discrimination, in violation of Title II of the ADA and the Fair Housing Act.

WHEREFORE, the plaintiffs respectfully request the following relief against the defendants:

1. Preliminary and permanent injunctions requiring New Berlin and Mayor Chiovatero to recognize that development of the MSP City Center Site has received all municipal approvals necessary to commence and complete the development and prohibiting the defendants from further interfering with the plaintiffs' prompt completion of the development.

2. To the extent that injunctive relief is unavailable or does not fully prevent the harm to which the defendants' illegal actions have subjected the plaintiffs, compensatory damages in an amount to be determined at trial, but no less than $12,995,996, and punitive damages as permitted by law.

3. Their costs and disbursements, including all expenses and reasonable attorneys' fees, pursuant to 42 U.S.C. §§ 1988, 3613(c)(2), and 12133 [incorporating 29 U.S.C. § 794a(b)] and any other applicable law.

4. Such other relief as the Court deems just and proper.

        s/ Thomas L. Shriner, Jr.
        Thomas L. Shriner, Jr.
        Wisconsin Bar No. 1015208
        G. Michael Halfenger
        Wisconsin Bar No. 1024062
        Bryan B. House
        Wisconsin Bar No. 1022054
        Jacob W. Nelson
        Wisconsin Bar No. 1070832
        Foley & Lardner LLP
        777 East Wisconsin Avenue
        Milwaukee, Wisconsin 53202-5306
        414-271-2400
        414-297-4900 (Facsimile)
        tshriner@foley.com
        mhalfenger@foley.com
        bhouse@foley.com
        jnelson@foley.com
        Attorneys for the Plaintiffs